**Tom H. and Sandra DUNHAM, as Legal Representatives of the Estate of Tess A. Dunham, Petitioners,**

v.

**SECRETARY OF the DEPT. OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 89–36V.**

United States Claims Court.

Nov. 22, 1989.

---

**634**

Marion Ray, Charleston, W. Va., for petitioners.

---

## ORDER FOR ENTRY OF JUDGMENT

RADER, Judge.

The National Childhood Vaccine Compensation Program, 42 U.S.C. §§ 300aa–1—300aa–33 (Supp. V 1987) (the Act), sets forth standards for compensating victims of mandatory vaccinations. The Act authorizes special masters to take evidence and recommend judgments to the United States Claims Court. On November 1, 1989, Chief Special Master Golkiewicz filed a recommended judgment in favor of the parents of Tess A. Dunham, a child who died after administration of a diphtheria-pertussis-tetanus vaccine.

Neither party has filed an objection to the chief special master's recommended findings or conclusions of law. The time for filing objections has passed.

After review of the record, this court adopts the chief special master's Report and Recommendation of Judgment according to 42 U.S.C. § 300aa–12(d)(2). This court incorporates into its Order the chief special master's Report. Thus, the Report is attached and will appear as part of this Order.

It is ordered,

The Clerk of the Court shall enter judgment for petitioners in the amount of $267,-246.66, consisting of $250,000.00 for the death of petitioners' daughter, Tess, and $17,246.66 for attorney fees and costs.

No additional costs.

## REPORT AND RECOMMENDATION OF JUDGMENT [1]

GOLKIEWICZ, Chief Special Master.

Petitioners seek compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereinafter the Vaccine Act), for the death of their minor child, Tess A. Dunham, allegedly resulting from a diphtheria-pertussis-tetanus (hereinafter "DPT") vaccine inoculation on November 4, 1985.

Petitioners filed a petition for compensation on April 10, 1989. Pursuant to Vaccine Rule 12(a)(1), respondent is required to file its answer within 45 days after the filing of the petition. Respondent neither entered a notice of appearance in this case nor filed an answer within the 45-day period provided for in the Vaccine Rules. Accordingly, on July 24, 1989, petitioners filed an Application for a Recommendation of Default Judgment pursuant to Vaccine Rule 55(a) [2] for respondent's failure to

---

1. This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12(c) (Supp. V 1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12(c) and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it

shall be deemed that there is no material subject to § 300aa–12(c).

2. Vaccine Rules 55(a) provides:
 *Rule 55. Default.*
 (a) *By the Judge.* In all cases, the party entitled to a judgment by default shall, prior to the submittal of the report by the special master, apply for a recommendation.... If,

plead or otherwise participate in this case. Petitioners requested that the special master hear oral argument on petitioners' motion for judgment by default. Petitioners' request was granted and oral argument was heard.

Vaccine Rule 55(c) provides that "[n]o judgment by default shall be entered against the respondent unless the petitioner establishes a claim or right by evidence satisfactory to the judge." In accordance with the Vaccine Act's evidentiary standards and for the reasons set forth below, it is concluded that petitioners have demonstrated by a preponderance of the evidence petitioners' right to compensation and, accordingly, judgment by default should be entered in favor of petitioners and against respondent. Therefore, pursuant to 42 U.S.C. § 300aa–12(c) and Vaccine Rule 18(a), the undersigned recommends to the assigned Claims Court judge, Judge Rader, that the court enter judgment for default in favor of petitioners in the amount of $267,246.66, consisting of an amount of $250,000 for the estate of the deceased and an amount of $17,246.66 for attorneys' fees and other costs.

I

FINDING OF FACTS

The following facts are fully supported by the record and, therefore, are so found:

Tess A. Dunham was born to Sandra and Tom Dunham on April 16, 1985, at 1:50 p.m. at the Latter–Day Saints Hospital in Salt Lake City, Utah. *See* Petition for Vaccine Compensation, *Dunham v. Secretary of the Dep't of Health and Human Services*, No. 89–36V, Ex. D at 93 (Cl.Ct., filed April 10, 1989) (hereinafter "P Ex. —— at

——").[3] Sandra Dunham gave birth by spontaneous vaginal delivery. *Id.* There was no evidence of any complications with the pregnancy or delivery. P Ex. D at 90. At birth, Tess Dunham weighed 8 pounds–6 ounces and measured 21½ inches in length. *Id.* Apgar tests which numerically score the condition of a new born by assessing the newborn's heart rate, respiratory effort, muscle tone, reflex irritability and color, were conducted on Tess at one and five minutes after birth and resulted in scores of 8 and 9, respectively, out of a maximum score of 10. *Id.* In the "Newborn Assessment" of Tess taken at 2:15 p.m., the infant was found to be "normal" in every respect. P Ex. D at 90. Mother and child were discharged from the hospital on April 19, 1985. The "Nursery Discharge Summary" reported Tess' status as that of a "normal newborn." P Ex. D at 104.

On May 14, 1985, at the age of one month, Tess was brought into the Tanner Memorial Clinic in Layton, Utah for a well-baby visit with Dr. Frank D. Kramer, the child's pediatrician. Dr. Kramer noted in his record of the visit that Tess was a "basically healthy one month old infant." P Ex. D at 12.

On July 1, 1985, Tess received her first DPT vaccine and an oral polio (hereinafter "OPV") vaccine. P Ex. D at 105. No adverse reactions were noted, although Tess' mother reported some irritability and slight fever after the first administrations. P Ex. D at 33; *see also* P Ex. C.

On November 4, 1985, at approximately 3:00 p.m., Tess received her second DPT shot and OPV drink. P Ex. D at 105. At 7:00 p.m., on the evening of November 4, 1985, Tess was irritable and slightly fever-

---

in order to enable the special master to enter a recommendation as to judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the special master may conduct such hearings or order such references as is deemed necessary and proper.

3. The petition consists of Exhibits A through E. Exhibit A contains documents regarding letters of administration and heirship. Exhibits B and

C are Tom and Sandra Dunham's affidavits, respectively. Exhibit D contains 87 numbered pages of relevant medical records and correspondence regarding Tess' condition. Exhibit E is the death certificate of Tess Dunham. Subsequent to the filing of the petition, petitioners filed with the court August 7, 1989, additional medical records regarding the pre-natal and neonatal condition and care of Tess Dunham, paginated 88 through 105. For ease of reference, these additional records will be considered a part of Exhibit D.

ish. P Ex. D at 33. At 11:30 p.m., Tess screamed uncontrollably for approximately 20 minutes. *Id.* At 11:55 p.m., Tess suddenly stiffened up for a few seconds and then had rhythmic jerking of all extremities for approximately 5 to 8 minutes. *Id.*

Tess was brought to the emergency room of Humana Hospital Davis North Hospital (hereinafter "HHDN") and admitted to the care of Dr. Kramer. P Ex. D at 33. Her temperature was measured at 101.1 degrees Fahrenheit. *Id.* Dr. Kramer described Tess' condition as a "[s]ix month old infant with generalized tonic clonic seizure after the second DPT and polio." P Ex. D at 34.

Dr. Craig Banta, the consulting neurologist, performed an electroencephalogram (hereinafter "EEG") on Tess on November 19, 1985. P Ex. D at 10. The EEG was normal "except for intermittent slow-wave activity over the right hemisphere and excessive sharp-wave activity." *Id.*

On the morning of November 28, 1985, Tess was fussy and crying, but afebrile.[4] P Ex. D at 30. At approximately 4:30 p.m. that same day, Sandra Dunham found Tess in her crib "on her stomach having a somewhat noisy breathing being pale and having her right arm jerking." P Ex. D at 30. Tess was again admitted to HHDN for a prolonged right focal seizure. Dr. Kramer observed spontaneous movements of Tess' left arm and left leg while the child was in the emergency room. *Id.* Dr. Banta also examined Tess during this admission and described Tess' "abnormal movements" as "right arm clonic movements". P Ex. D at 4. Tess was afebrile during her admission. P Ex. D at 28.

Tess was again admitted to the HHDN on the evening of December 4, 1985, for another focal seizure involving the right arm and leg, lasting for about ten minutes. P Ex. D at 12. Dr. Kramer notes in his records that Tess was running a low grade fever of 100 degrees upon examination of Tess at the emergency room. *Id.*

On December 15, 1986, Tess appeared fussy after a nap and had a temperature of 101 degrees. P Ex. D at 80. Tess suddenly fell forward and Sandra Dunham noticed rhythmic movement of the left arm and leg for approximately 15 minutes. *Id.* Tess was brought to the emergency room for treatment and subsequently admitted for further observation. Dr. Banta described this seizure as "a focal seizure with mild persistent left hemiparesis," and concluded that Tess had a "probable multifocal seizure disorder." P Ex. D at 24.

On January 12, 1986, Tess had another focal seizure in the left arm and leg which then progressed to a generalized tonic-clonic seizure. P Ex. D at 8, 77. Tess was admitted to HHDN for treatment. A physical examination of Tess taken at the time of admission reveals a temperature of 100.1 degrees. P Ex. D at 19, 77. Dr. Kramer, in his notes, concluded that Tess suffered from "status epilepticus" and "multi focal seizure disorder." P Ex. D at 78. Tess was discharged two days later on January 14, 1986.

Outpatient Clinic Record notes recorded by Debbie Hampton, RN, a neurology specialty nurse, with the Arkansas Children's Hospital in Little Rock, Arkansas, reveal that Sandra Dunham telephoned the hospital on January 17, 1986, to report that Tess had suffered three more seizure episodes. P Ex. D at 53. As well, Mrs. Dunham reported that Tess was experiencing drug toxicity from the levels of Tegretol administered to Tess for control of her seizures. The notes include another communication on January 24, 1986, from Mrs. Dunham that reports that Tess had four more seizures. *Id.* On March 31, 1986, while on a family vacation in Florida, Tess had yet another seizure. P Ex. D at 71.

In a letter dated June 3, 1986, Dr. Robert Woody, the child's new pediatric neurologist, reported to Dr. Robert Gosser, the child's new pediatrician, that Tess has had two seizures during the months of April and May 1986. P Ex. D at 64.

---

**4.** The term "afebrile" means "without fever." *Dorland's Illustrated Medical Dictionary* 35 (28th ed.1988).

Outpatient Clinic Record notes by Debbie Hampton, RN, report further communications with Mrs. Dunham, on July 24, 1986, concerning the increase in frequency of Tess' seizures in the week prior to the date of this note. P Ex. D at 62.

In a letter dated September 2, 1986, Dr. Woody reported to Dr. Henry Stroope that Mrs. Dunham had observed six seizures lasting less than a minute since June 1986. P Ex. D at 60. In follow-up records from the Tanner Memorial Clinic in Layton, Utah, with which Dr. Kramer is associated, it is recorded that Tess had three seizures on September 25, 1986. P Ex. D at 14. There was a notation in the records indicating that Tess was afebrile. *Id.*

From approximately December 5 through December 8, 1986, Dr. Woody reported that Tess has had several brief generalized seizures each lasting less than 45 seconds. P Ex. D at 47. Dr. Woody's notes stated that: "[H]er arms and legs become stiff and her eyes stare ahead, sometimes she cries through the seizures and sometimes the arms and legs jerk. She has as many as 5 seizures per day and occasionally goes days without seizures." *Id.*

Tess died on December 14, 1986. P Ex. E. The death certificate lists the cause of death as "possible aspiration due to or as a consequence of seizure disorder." *Id.* On March 7, 1989, Tom and Sandra Dunham were appointed by the state of Illinois as Independent Administrators of the estate. P Ex. A.

## II

### STATUTORY REQUIREMENTS

The Vaccine Act establishes an alternative to traditional tort litigation for providing compensation for injuries or deaths resulting from vaccines routinely administered to children. *See* § 300aa–10(a). In many cases under this compensation system, petitioners need not prove "causation". If petitioners demonstrate that the vaccine recipient suffered a certain illness or condition within a specified period of time following the administration of a specific vaccine and suffered such vaccine-related illness or condition for at least six months or died from the administration of the vaccine, petitioners are entitled to a presumption of causation and, accordingly, there is no requirement to prove that the vaccine caused the injury. §§ 300aa–11(c)(1) and 300aa–13(a)(1)(A). This presumption may be rebutted where evidence is produced to show that the injury was due to factors unrelated to the administration of the vaccine.[5] *See* § 300aa–13(a)(1)(B).

Under the relevant statutory provision, petitioners are entitled to an award of compensation if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance[6] of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

§ 300aa–13(a)(1).

Under the above-mentioned section 300aa–11(c)(1), petitioners can establish their right to entitlement to compensation by showing that the vaccine recipient—

(A) received a vaccine set forth in the Vaccine Injury Table[7]....,

\* \* \* \* \* \*

**5.** Unrelated factors do not include "idiopathic, unexplained, unknown hypothetical, or undocumentable cause, factor, injury, illness, or condition...." § 300aa–13(a)(2)(A).

**6.** The preponderance of evidence standard requires that the trier of fact "believe that the existence of a fact is more probable than its nonexistence before [the special master] may

find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harland, J. concurring), *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States*, 6 Cl.Ct. 476, 486 (1984).

(B)(i)(I) received the vaccine in the United States or in its trust territories,

\* \* \* \* \* \*

(C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table....

\* \* \* \* \* \*

(D)(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1,000, or (ii) died from the administration of the vaccine, and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death....

§ 300aa–11(c)(1). Petitioners' claim is measured against these standards.

### III

### ENTITLEMENT

■ For the reasons set forth below, the undersigned finds that petitioners have demonstrated by a preponderance of the evidence that petitioners have satisfied all of the section 300aa–11(c)(1) elements and, therefore, are entitled to an award of compensation under the Vaccine Act.

**1. Administered a table vaccine in the United States.** Immunization records from

---

7. The petition in the instant case alleges that the death of Tess Dunham is the result of the administration of a Diphtheria–Pertussis–Tetanus (or DPT) vaccination. The table includes the following vaccines: DPT, DPT/Polio combination, or any other vaccine containing whole cell

---

the Davis County Immunization System establish that Tess Dunham received a DPT vaccine in the United States, specifically, the state of Utah, thus fulfilling the requirements of parts (A) and (B) of § 300aa–11(c)(1). P Ex. D at 105.

**2. Suffered a table injury.** The undersigned finds that petitioners have demonstrated by a preponderance of the evidence that Tess Dunham suffered a residual seizure disorder and died as a result of such disorder.

The Vaccine Act sets forth the following qualifications and aids to interpretation for a residual seizure disorder:

(2) A petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine involved and if—

\* \* \* \* \* \*

(B) in the case of any other vaccine [other than a measles, mumps, or rubella vaccine], the first seizure or convulsion occurred within 3 days after administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

\* \* \* \* \* \*

(4) For purposes of paragraphs (2) and (3), the terms "seizure" and "convulsion" include grand mal, petit mal, absence, myoclonic, tonic-clonic, and focal motor seizures and sign....

§ 300aa–14(b)(2)(B), (4).

Petitioners have clearly met the Act's definitional requirements of a residual seizure order as set out below:

pertussis bacteria, extracted or partial cell bacteria, or specific pertussis antigen(s), measles, mumps, rubella, or any vaccine containing any of the foregoing as a component, DT, Td, or tetanus toxoid, live and inactivated polio vaccine. § 300aa–14(a).

**a.** *Incidence of seizures prior to the administration of the DPT vaccine.*

There is no evidence in the record that indicates that Tess had a history of seizures, febrile or afebrile, prior to the first recorded seizure on November 4, 1985, following the DPT vaccination.

**b.** *Onset of the first seizure within three days of the DPT vaccine.*

Medical records made contemporaneously with Tess' first seizure clearly indicate that the first seizure occurred within approximately nine hours after the receipt of the DPT vaccination. *See* P Ex. D at 33; *see also* P Ex. B at 2–3 and P Ex. C at 2. The medical history included in the November 5, 1985, record reads:

> Tess is a 6 month old infant that is admitted to HHDN for a *febrile seizure that occurred 9 hours after her second DPT vaccine.*
>
> Tess received her second DPT and polio at 3 o'clock in the afternoon at the Davis County Health Department. At 7 o'clock in the evening she appeared quite fussy and was running a low grade fever. At 11:30 in the evening she screamed uncontrollably for approximately 20 minutes. Then at 11:55 in the evening she suddenly stiffened up for a few seconds then she had rhythmic jerks with all extremities for approximately 8 minutes. Her eyes were open and were turning backwards. She was then brought to the Emergency Room and admitted under my service on the pediatric floor.

P Ex. D at 33 (emphasis supplied). The parents' affidavits are consistent with the above-cited contemporaneous medical records. *See* P Exs. B and C.

**c.** *Suffered two or more seizures within one year after the administration of the DPT vaccine which were afebrile or febrile (less than 102 degrees Fahrenheit).*

It is somewhat unclear whether the requirement of two or more seizures means that the person must suffer two additional seizures after the first seizure following the DPT vaccination or one additional seizure as the first seizure is included in the two or more seizures. However, whether the number of seizures is two or three is irrelevant in this case as Tess suffered seizures far in excess of two or three before her death on December 14, 1986. A review of her entire medical history reveals that Tess experienced more than 25 seizures before her untimely death. *See, e.g.,* P Ex. D at 12, 13, 14, 24, 30, 33, 47, 51, 53, 60, 62, 64, 71, 77, 80.

Also, the seizures in which a temperature had been measured and subsequently documented in the medical records indicate that each such seizure was either accompanied by no fever or by a fever of less than 102 degrees Fahrenheit.[8] *See, e.g.,* P Ex. D at 12 ("100 degrees"); 14 ("no ... fever"); 19 ("100.1"); 28 ("afebrile"); 47 ("[s]he has not had any fever"); 77 ("temperature of 100.1"); and 80 ("temp of 101 degrees").

**d.** *"Seizure" as defined by the Vaccine Act.*

As recited above, the terms "seizure" and "convulsion", within the confines of the Vaccine Act, include grand mal, petit mal, absence, myoclonic, tonic-clonic, and

---

**8.** A letter dated February 24, 1986, addressed to Dr. Bob Gosser from Dr. Robert Woody, contains a medical history of Tess which presents conflicting information regarding the time of the seizure and the temperature of the child. It reads in pertinent part:

> The child did well until November 4, 1985 when she had her first seizure. She was about 6 months old at that point. She had received her second DPT shot at about 8:00 A.M., at about 11:00 A.M. [s]he had her first seizure. This shot had been given at the Davis County Health Center in Farmington, Utah. The child had 104 fever and an irritable piercing cry.

P at 75. The facts found by this special master, *supra,* pp. 635–37, were supported by numerous contemporaneous records made by doctors who treated Tess at the time of her first seizure and thereafter. Dr. Woody was not Tess' treating physician at the time of the DPT inoculation but became such several months after. Given that this letter is the only reference to a temperature greater than 102 degrees and it is inconsistent with the wealth of contemporaneous evidence in the record, this special master is not persuaded by this singular reference to the higher temperature.

focal motor seizures and signs. *See* § 300aa–14(b)(4).

In his records of the November 5, 1985, seizure, Dr. Kramer labelled Tess' condition as a "generalized tonic clonic seizure." P Ex. D at 34. As well, there are numerous records of Drs. Banta, Kramer and Woody in the petition which describe Tess' condition as a: "focal seizure" (P Ex. D at 5, 8, 12, 13, 16, 28), "focal seizure with mild left hemiparesis" (P Ex. D at 24); "generalized tonic clonic seizure" (P Ex. D at 8, 16, 23, 24, 34); "multifocal seizure disorder" (P Ex. D at 8, 16, 24); and "right sided focal seizure with mild right hemiparesis" (P Ex. D at 24). These contemporaneous diagnoses place Tess' condition clearly within the stated definition of a residual seizure disorder under the Vaccine Act. *See* § 300aa–14(b)(4).

**3. Died from the administration of the DPT vaccination or suffered the residual effects or complications of the injury, illness, condition for greater than six months.** The record indicates that Tess died due to her seizure disorder. The death certificate lists the cause of death as "possible aspiration due to or as a consequence of seizure disorder." P Ex. D at 46. As well, a March 4, 1987, letter from Barbara McCurdy, a claims examiner for Beneficial Insurance Group, denying the Dunhams a death benefit, cites as its reasoning for the denial: "According to the physician's statement, medical records and death certificate we have been provided, the cause of your daughter's death was aspiration during seizure disorder. As her death was the result of her illness rather than accidental injury, no benefits are due." P Ex. D at 43. The record supports the conclusion that Tess died from the DPT inoculation.

As well, Tess suffered the residual effects of the residual seizure disorder for greater than six months. She experienced her first seizure on November 4, 1985, and continued to experience seizures up until her death, approximately 13 months later.

In any event, this requirement of the Act is clearly met.

**4. Never collected an award or settlement for the death of Tess Dunham.** Both Tom and Sandra Dunham have separately averred that, as legal administrators to the estate of Tess Dunham, they have never collected an award or settlement for the death of their daughter, Tess Dunham. *See* P Exs. B and C.

**5. Alternative cause.** To find that a petitioner is entitled to compensation under the Act, the special master must find "that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." § 300aa–13(a)(1)(B). Although the respondent did not appear and present evidence on this issue and, therefore, failed to meet its burden on this issue, after a close examination of the record, it is found that there is not a preponderance of the evidence that Tess' death was due to factors unrelated to the administration of the DPT vaccine.

## IV

### AMOUNT OF COMPENSATION

Section 300aa–15(a)(2) of the Act provides for a fixed award of $250,000 to compensate for a vaccine-related death.

## V

### ATTORNEYS' FEES AND COSTS

The Vaccine Act provides that a judgment on a petition awarding compensation under the Act shall include an amount to cover reasonable attorneys' fees and other costs. § 300aa–15(e). For cases, such as this one, where the vaccine was administered prior to the effective date of the Act, an award of attorneys' fees and other costs is limited to $30,000. § 300aa–15(b).[9] The award of attorneys' fees under the Act is to be the exclusive payment; no additional

---

**9.** The $30,000 statutory limitation also includes any award made for pain and suffering and lost wages. *See* § 300aa–15(b).

charges are to be levied by the attorney in connection with the prosecution of a petition filed under the Act. *See* § 300aa–15(e)(3).

 Consistent with the vast body of case law interpreting "reasonable attorneys' fees" under a variety of federal fee shifting statutes, the court has determined that the appropriate method for computing reasonable attorneys' fees under the Vaccine Act is the "lodestar" method, subject to appropriate adjustments. *See Lolley v. Secretary of the Dep't of Health and Human Services*, No. 88–33V, 1989 WL 132196 (Cl.Ct. October 18, 1989) (Robinson, J., adopting this special master's recommended decision using the lodestar method).

The lodestar is the product of the reasonable hours expended multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). The reasonable hourly rate represents "the prevailing market rates in the relevant community" for similar services performed by lawyers of comparable skill, experience, and reputation. *Blum*, 465 U.S. at 895, 104 S.Ct. at 1547, 79 L.Ed.2d 891 (1984).

The lodestar figure is subject to adjustment, either upward or downward, through the application of a variety of subjective factors. *See Blum*, 465 U.S. at 897, 104 S.Ct. at 1548 (citing the 12 factors outlined in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974). Essentially, the application of these factors allows the court to adjust the objective lodestar figure to account for the particular facts and circumstances of a given case. However, many of the *Johnson* factors, such as "novelty", "complexity of issues", "results obtained", and "quality of representation" are generally reflected in billable hours or the hourly rate used in calculating the lodestar figure and, therefore, should not provide an independent basis for

adjusting the award. *See Blum*, 465 U.S. at 898–99, 104 S.Ct. at 1548–49.

The fee applicant carries the burden of proof. To meet said burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As Judge Harkins wrote in *Martin v. United States:*

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

*Martin v. United States*, 12 Cl.Ct. 223, 227 (1987) (citing *Hensley v. Eckerhart*, 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943.) To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. The applicant need not account for every minute expended. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

The Supreme Court in *Blum* recognized that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. In discussing the applicants burden, the Court stated that:

> To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11. Against the above-stated guidelines, the

court reviews the petitioners' application for attorneys' fees and other costs.

Counsel for petitioners has submitted a petition for attorneys' fees and costs which requests $23,462.50 for attorneys' fees and $3,315.61 for costs incurred, for a total claim of $26,778.11. *See* Attorney Fee Petition, *Dunham v. Secretary of the Dep't of Health and Human Services,* No. 89–36V (filed August 25, 1989). A summary of the time and expenses claimed are as follows:

Time Expenditures

| | | | |
|---|---|---|---|
| Marion Ray (attorney-of-record) | 127.25 hrs@ | $150/hr = | $19,087.50 |
| Thomas Wilson (partner) | 1.50 hrs@ | $150/hr = | 225.00 |
| Paulette Clendenin (paralegal) | 70.75 hrs@ | $ 50/hr = | 3,537.50 |
| Linda Ward (paralegal) | 1.00 hrs@ | $ 50/hr = | 50.00 |
| Miscellaneous | 7.50 hrs | | 562.50 |
| Total | 208.00 hrs | | $23,462.50 |

Expenses

| | |
|---|---|
| Postage Charges | $ 32.28 |
| Duplication Expenses | 853.36 |
| Computer Research | 900.00 |
| Medical Records | 83.50 |
| Telephone Expenses | 39.50 |
| Filing Fee | 120.00 |
| Expert Fee (Robert C. Woody, MD) | 200.00 |
| Appointment of Administrators of the Estate of Tess Dunham | 337.35 |
| Travel Expenses to NCVIA Seminar | 140.59 |
| Travel Expenses to Hearing | 537.03 |
| Transcript | 50.00 |
| Travel Expenses (miscellaneous) | 22.00 |
| Total | $3,315.61 |
| Total Attorneys' Fees and Expenses | $26,778.11 |

*Reasonable hourly rate*

Petitioners' counsel, Marion Ray, is an associate in the law firm of Hunt & Wilson in Charleston, West Virginia. In the fee petition, counsel claims an hourly rate of $150.00. In support of this rate, counsel offers the affidavit of Monty L. Preiser. *See* Affidavit of Monty L. Preiser, *Dunham v. Secretary of the Dep't of Health and Human Services,* No. 89–36V (filed August 25, 1989). Mr. Preiser, who has practiced law for approximately 12 years in the state of West Virginia and who has spent much of his practice in the field of personal injury, avers that the range of hourly rates for "an attorney of Mr. Ray's experience in the area of pharmaceutical products litigation ... [is] $145.00 to $175.00...." He further states that such range of rates is "a fair, reasonable and typical charge for such services in the County of Kanawha, State of West Virginia." *Id.* Based on the supporting affidavit and the court's knowledge of hourly rates approved in other vaccine cases pursued under the Act, the undersigned concludes that the hourly rate of $150 is reasonable for an attorney of Mr. Ray's experience and ability practicing under the Vaccine Act.

In the fee petition, counsel also requested an hourly rate of $50 for paralegals. Although, petitioners provided no documentation to support such a rate, it is this special master's experience that the hourly rate of $50.00 for paralegals is reasonable.

*Reasonable hours expended*

Congress, spurred by the high transactional costs and the uncertainty of the traditional torts litigation involving vaccine-related deaths or injuries, developed a com-

pensation system which would provide a swift, simplified and inexpensive means to resolve such cases. *See* H.R.Rep. No. 908, 99th Cong. 2d Sess., 1, 13, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6354. The cost of processing a case under such a system was estimated to be in the range of $10,000 to $50,000 per case. The legislative history of the Act advised that:

> [The Congressional Budget Office] also estimates that the legal costs and attorneys' fees will be $50,000 per case in the compensation system. The Committee has assumed that costs under a no-fault, non-adversarial system will be significantly lower. With most evidentiary requirements specified in the legislation, with prohibitions on traditional discovery and courtroom procedure, and with no obligations to demonstrate negligence or product defectiveness, the costs of legal services will more closely approximate those incurred in such systems as the Black Lung benefits program or workers' compensation programs. In these systems, legal costs rarely rise above $10,000 per case. The Committee has, therefore, assumed that legal costs may be as much as $15,000 per case in the compensation Program.

*See* H.R.Rep. No. 908, 99th Cong. 2d Sess., 1, 36, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6377–78. The estimated range of attorneys' fees envisioned by Congress represents a continuum of costs based on the degree of complexity of the individual case. Where the case is difficult and requires a complete ventilation of the issues complete with appearances of the various expert witnesses, the case would most probably fall at the higher end of the continuum. The flip-side is also true. Where the case is well-documented and non-controversial, the cost of handling the case should be on the lower end of expected costs. The case at issue represents the latter situation.

The resolution of this case was accomplished readily with limited participation by the special master in the form of one status conference, one prehearing conference and one oral argument which involved the pre-sentation by the petitioners' counsel alone. No experts were presented to the court, nor were they required. This was a straightforward case. Petitioners' counsel, while doing a complete and thorough job in representing his client, was able to fully present his case through the medical records. The case required formal involvement of approximately three hours of the court's time—a generous estimate at that. While allowing for counsel's need to educate himself with the Act's specific requirements and, thereafter, to prepare petitioners' case adequately for presentation to the court, the straightforward nature of this case and the lack of an adversary in this particular instance places this case squarely at the lower end of expected costs.

Petitioners' counsel has submitted a summary of hours expended in this petition. The summary sets forth the dates and the character of the service performed, the number of hours expended for each service provided and the initials of the attorney or paralegal providing the service. *See* Attorney Fee Petition, *Dunham v. Secretary of the Dep't of Health and Human Services*, No. 89–36V (Cl.Ct. filed August 25, 1989).

■ In determining the reasonableness of time spent, the court in *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984), "look[ed] to the documents submitted to the courts and to the hours claimed to determine whether a reasonable number of hours was spent, given the nature of the task at hand and the results achieved. *Id.* at 952. Those hours which reflect "excessive, redundant or unnecessary" hours shall be excluded. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982). In requesting statutory attorneys' fees, an attorney must use the same "billing judgment" as he would use in billing a client. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority. *Id.* 103 S.Ct. at 1939–40. The focus of the court's attention then will be on those hours which are excessive, redundant or unnecessary. The remainder of the hours requested have been carefully scruti-

nized and, having found that the hours were reasonably spent, warrant no further discussion.

First, petitioners have claimed 16 hours for research of the Vaccine Act prior to the filing of the petition in this case. These hours were in addition to over 20 hours spent communicating with the client, reviewing the records and consulting with a medical expert prior to the filing of the petition. No explanation or justification for this large number of preliminary hours was given. Therefore, given the relative straightforward nature of the Act and the facts of this case, the number of hours spent prior to the filing of the petition for such research is clearly excessive and, accordingly, is reduced to eight attorney hours.

Second, petitioners have claimed a total of 25.75 attorney hours for the drafting of a motion for default judgment and a memorandum supporting petitioner's motion for default judgment.[10] An order issued by this special master on June 6, 1989, notified the petitioners that the 45–day time limit in which the respondent has to answer the petition had passed and further explained the appropriateness of a motion for recommendation of default judgment under Vaccine Rule 55(a), if petitioners should decide to proceed in that fashion. As well, the order specifically requested that the application include "by way of exhibit or by specific reference to documents which have been filed with the court—affidavits and other documents sufficient to establish petitioners' right to relief and the amount of compensation to which petitioners are entitled, including costs and attorneys' fees." *See* Order of chief special master, *Dunham v. Secretary of the Dep't of Health and Human Services*, No. 89–36V (Cl.Ct. June

6, 1989). Although well written, the petitioners' memorandum spent several pages justifying the use of the default judgment motion. The June 6, 1989, order clearly provided petitioners with such an option. All that was required, therefore, was a recitation of the facts with specific references to the appropriate medical records, affidavits, or other documents, sufficient to satisfy the statutory requirements of the Vaccine Act. In essence, the bulk of this work was accomplished in preparing and filing the petition. Substantial attorneys' fees were claimed for and provided for performing these respective tasks. Accordingly, this expenditure of time, totalling 25.75 hours, represents a duplication of efforts and, therefore, must be reduced to 12 attorney hours.

Third, petitioners claim an inordinate number of hours for the preparation of exhibits for the oral argument to be presented to the court on August 4, 1989.[11] The hearing exhibits represented the contents of the petition plus seventeen additional newborn baby medical records.[12] Apparently, the time expended was used to duplicate the records as needed, organize them in the fashion presented, and thereafter, make sufficient copies of the entire notebook for presentation. Notwithstanding the excellent exhibit presentation, the claim for 35.75 hours is clearly excessive and is reduced to 10 paralegal hours.

Fourth, petitioners claim twenty (20) attorney hours ($3,000) for preparation for the oral argument held on August 4, 1989, plus an additional 6 paralegal hours for the "preparation for petition presentation." Counsel's presentation to the court was methodical and well-presented. However, counsel was essentially "walking" the spe-

---

**10.** The fee petition included entries totalling 9.5 hours ($2,249.50) for the drafting of a memorandum supporting petitioners' motion for default judgment. As well, there was an additional expenditure of time totalling 16.25 hours ($2,325.00) for "research and draft motion for default judgment." Hours expended for the "motion" and "memorandum" shall be considered as one since the submission consisted mainly of the memorandum with a simple one page request for a recommendation for default judgment.

**11.** Petitioners claim 34 paralegal hours ($3,000) under the entry of "preparation of hearing exhibits" and an additional 1.75 attorney hours ($262.50) claimed for "organizing medical records." Presumably, the two activities are the same as the hearing exhibits are predominantly medical records.

**12.** These additional records were filed by leave of the special master on August 7, 1989.

cial master through the case by matching the various medical records to the Act's requirements. Much of this preparatory work was accomplished in preparing the petition and doing initial research. Since sufficient hours have been claimed for those respective tasks, these charges to a great extent are duplicative and must be reduced to 10 attorney hours.

Fifth, petitioners have claimed a total of 6.5 attorney hours and 0.5 paralegal hours for a total of $400 under the entries of "timeline", "review timeline" and "review of time line". These entry titles offer no explanation of the activity. In the absence of further explanation, the special master is unable to determine the reasonableness of this particular entry. Therefore, the hours allotted for such activity must be disallowed.

Finally, petitioners also claimed 7.5 hours for a total of $562.50 of "miscellaneous" activities.[13] As with the above entries, there is no explanation for such expenditure of time. Therefore, this expenditure is disallowed.

Accordingly, the time expenditures for attorney hours are reduced by a total of 40 hours, paralegal hours are reduced by a total of 30.5 hours and miscellaneous time expenditures are reduced by a total of 7.5 hours. Therefore, the time expenditures found reasonable are as follows:

| | | |
|---|---|---|
| Attorney Total | 88.75 hours at $150/hour = | $13,312.50 |
| Paralegal Total | 41.25 hours at $ 50/hour = | $ 2,062.50 |
| Total | | $15,375.00 |

This special master finds that $15,375.00 is a reasonable amount to be awarded for attorneys' fees in this case.

*Reasonable Expenses*

In scrutinizing petitioners' submission entitled "Advance Costs", most of the expenses incurred are reasonable and therefore, awardable. However, certain other costs upon review appear excessive and for that reason will be the focus of the following discussion.

First, petitioners claim $900.00 for computer research. There is no explanation as to the type of research performed nor the basis for such costs. As well, computer research at this point in the history of the Vaccine Act is basically futile as no case-law exists. Furthermore, were the computer research services employed in researching the issue of default judgment, it is questionable whether such limited research would consume such large quantities of time and expense. Therefore, the court finds a reasonable allowable cost for computer research for this case to be $200.00.

Second, the duplication costs, totalling $853.36 are excessive. Even allowing for a generous amount of copies (2000), the cost per copy appears to be in the range of 0.50 to 0.56 cents per page. This is entirely unreasonable. Therefore, the allowable expense is reduced to $250.00.

Finally, petitioners are claiming travel expenses for a trip to the NCVIA (presumably National Compensation Vaccine Injury Act) Seminar in Washington, D.C., in the amount of $140.59. Petitioners have provided no basis for charging this expense to this case. Accordingly, the expense is disallowed.

Therefore, the total costs awardable to petitioners under section 300aa–15(e) are $1,871.66.

## VI

## CONCLUSION

In view of the foregoing, it is recommended that judgment be entered for peti-

---

**13.** Although no hourly rate was given, the $562 figure is apparently based on a $75–per–hour rate.

tioners in the amount of $267,246.66, consisting of $250,000 to compensate petitioners for the death of petitioners' daughter, Tess Dunham, and $17,246.66 for attorneys' fees and other costs.